STEPHENS, Judge.
Defendant Jamal Hassan Al Jaher appeals from a domestic violence order of protection ("DVPO") entered against him in Guilford County District Court. Al Jaher argues the district court erred in finding that he placed his wife, Plaintiff Wafa Osman, in fear of imminent serious bodily injury, and in concluding that he committed an act of domestic violence against her. We affirm the district court's order.
Facts and Procedural Background
On 1 May 2015, Osman filed a complaint and motion for DVPO against Al Jaher, alleging generally:
In January of this year, [my] husband and I separated, and I moved to a different residence. Since that time, he has continued to harass me whenever I go to pick up our daughter from his residence. His actions include coming out to the car and yelling at me, not allowing me to leave when I desire, and generally threatening me. I am very afraid of Jamal. Throughout our 27 year relationship he physically and emotionally abused me. He punched me, smacked me, kicked me, burned me, and he even poured trash on me.
Osman further alleged:
[O]n April 19, 2015, I went to pick our daughter, Fatima, up from his residence, and he came out to the car and began ranting again. While he was doing so, Fatima came out of the house and got in my car at which point I tried to leave. However, he went and stood behind the car and said if I wanted to leave I could hit him.... Once I said [that I was calling the police], he ran to the passenger side door, opened it up, and pulled Fatima out of the car and dragged her in the house. As he was dragging her in the house, he yelled that I did not have a daughter anymore. My son called me 3 days later and told me to come pick her up. He said she hadn't eaten because of her nerves, and was ill. When I went to pick her up, my son and Jamal started fighting about the situation and the police had to be called.
On this basis, the district court entered an ex parte DVPO against Al Jaher on 1 May 2015. On 14 May 2015, Al Jaher filed his answer and a motion to dismiss. On Osman's continuance, the return hearing was held 5 June 2015.
During the hearing, Osman testified that she and Al Jaher were married in Sudan, at some point moving to Saudi Arabia before again migrating in 2002 to the United States. Together for a total of twenty-seven years, the parties have five children between them-though only Fatima, their eight-year-old girl, was a minor in 2015. Osman ended the relationship by leaving the marital residence with Fatima on 10 January 2015.
Osman testified that, since their first child's birth in 1988, she had endured a long history of physical abuse by Al Jaher in retaliation for trivial or perceived wrongs, particularly in relation to her childrearing. After the birth of their first child, Al Jaher struck her for being startled by a rodent in the kitchen. On another occasion, because she could not sew clothing for their children, Al Jaher beat her with a chair until it shattered. In about 1997, Al Jaher burned Osman's arms with a hot iron as punishment for a child's accidental injury. Once, while Osman was pregnant, Al Jaher beat her limbs with a cable until they bled.
Osman testified that she wished, during August 2014, to take Fatima to see her dying grandmother in Qatar, but Al Jaher took the girl's passport. She testified further that, while searching for the passport, she was discovered by Al Jaher, who then hit her. Osman grabbed her husband's leg to prevent him from leaving with the passport, but he dislodged her with a kick to the chin. The police were called, but Osman testified she "didn't realize that [she had] bruise [sic] and hits on [her] arm when the police [come] because [she was] wearing [a] long sleeve and long dress. [She] didn't notice...." No charges were filed.
Per Osman, this altercation motivated her to apply for a separate bank account and apartment. Osman testified that on 10 January 2015, she and Fatima secretly departed the marital residence without telling Al Jaher about the new apartment. The first night in their new residence, however, Osman became afraid when Al Jaher tracked her cell phone directly to their unit. As Al Jaher banged on the door, Osman and her daughter became very scared and called the police.
After January 2015, Fatima lived at Osman's new residence full-time, but continued to see Al Jaher during most weekdays because he refused to allow her to ride the bus to the new apartment. Instead, Al Jaher required Osman to pick up and drop off Fatima at his office or residence on a daily basis. She testified that Al Jaher prolonged these meetings to cause confrontations and demand her return to the marriage. Osman testified that Al Jaher would then escalate these confrontations by preventing Fatima from leaving the house to enter the car or by placing his limbs inside the vehicle to physically block Osman from driving away. Osman testified that, on one occasion, Al Jaher physically pulled her out of the vehicle by her arms and head.
Osman testified that on 19 April 2015, Fatima realized she needed a hairdryer from Al Jaher's residence. Osman drove to the apartment with her windows up and doors locked, fearing a confrontation with Al Jaher. Osman testified that when Fatima ran into the house, Al Jaher approached the vehicle, "screaming" at Osman. Before the car's doors could be re-locked upon Fatima's re-entry, Al Jaher opened the door and pulled her back out. Walking the girl inside his residence, he told Osman that she "did not have a daughter" anymore. Although Osman called the police, she lacked a custodial order to compel Fatima's return.
Three days later, on 22 April 2015, Osman received a phone call from one of the parties' older sons, Mohammad, who expressed concerns about Fatima's health at Al Jaher's residence and urged Osman to retrieve Fatima. Again worried about a confrontation with Al Jaher, Osman locked her car's doors and closed its windows, and drove to the former martial residence. Osman testified that when she arrived, Al Jaher and Mohammad were fighting one another in the front yard, with Mohammad holding Fatima in one arm and her effects in the other. Due to the confrontation, Osman called the police. As Osman opened the locks to let Fatima in the vehicle, Al Jaher again took advantage of the temporary breach to enter the vehicle and hit Osman on her shoulder. Before the police arrived, Al Jaher exited the vehicle and stood behind it, which blocked her path and prevented her from leaving. Upon arrival, Greensboro Police Department Officer P.D. Henley de-escalated the situation and enabled Osman to leave with Fatima.
Officer Henley testified that the scene was "heated" when he arrived. Al Jaher was standing behind Osman's vehicle, and told Henley that he did not want Osman to leave. Henley further testified that Al Jaher and Mohammad continued their argument, but, as the conversation was at least in part spoken in a foreign language, Henley could not understand what was said. Henley then interviewed Osman, who told him Al Jaher had struck her. Henley testified that he asked Osman "if she would let [him see the injury, but] based on their culture, she did not want [him] to look at it."
The testimony of Osman's friend and primary confidante, Lynda Merga, tended to show that Osman experienced constant fear of Al Jaher, before and after leaving the marital residence. Merga is an immigration paralegal who belongs to the same community of recent African immigrants in Greensboro. Merga attested she always "felt that something was wrong" with Osman's marriage. Merga further testified, regarding Al Jaher's abuses, that "beating and name calling ... where I come from, may have been normal, but [Osman] had discussed with me that it was getting to a point, it was really bad[.]" Merga testified that Osman contacted her about an "emergency" in August 2014, after Al Jaher had kicked her in the chin, at which point Merga helped Osman find a new lease. She continued to receive phone calls from Osman, who, she testified, remained "always terrified" of Al Jaher and his ploys to prevent her from leaving his residence when picking up Fatima after school. She testified that Osman told her she was scared because there "always[ ] would be a problem" when the two interacted after school.
Al Jaher was also present at the hearing. Denying that he ever acted violently toward Osman, Al Jaher testified that Osman called the police frivolously and accused her of "kidnapping" his daughter when she left the marital home on 10 January 2015. Al Jaher testified that on 19 April, when Osman came to his house, he attempted to discuss reconciliation but "she won't let me get into the car and she was just opening the window like five centimeters." He also claimed Fatima left Osman to go into his residence without his prompting because she was "really hot" in the car. Al Jaher testified that over the next three days she spent at his house, Fatima was unwilling to eat, sleep, or leave the couch and was constantly on the phone with Osman. Al Jaher testified that on 22 April, after learning that Mohammad had called Osman to come and retrieve Fatima, he attempted to calm the situation down by closing away Fatima in the master bedroom. Al Jaher claimed that Mohammad then punched through the door to grab Fatima and her belongings, at which point the altercation later observed by Osman began. Al Jaher further testified that he twisted his knee during the fight and that the injury forced him to stand behind Osman's vehicle to support his weight.
On this evidence, the district court found that, on both 19 and 22 April 2015, Al Jaher
placed [Osman] in fear of imminent serious bodily injury by ...
4-19-15: [Al Jaher] yelling at [Osman] when she took their minor child to [Al Jaher]'s residence to retrieve an item; [Osman] remained in the car [with] doors locked & windows cracked due to fear of [Al Jaher]. On 4/22/15, [Osman] went to [Al Jaher]'s residence to pick up their minor child (again, doors locked & windows all the way up). [Al Jaher] stood behind [Osman]'s vehicle and would not allow [Osman] to leave. [Al Jaher] had his hand on back of [Osman]'s car. [Osman] called police.
The court also found that the relationship was characterized by a "[h]istory of domestic violence by [Al Jaher] towards [Osman]," during which Al Jaher had "inflicted serious injuries upon the plaintiff" including "burning with iron on hands; bruises." Based on these findings, the district court concluded that "[Al Jaher] has committed acts of domestic violence against [Osman]" and continued the DVPO for one year.[1] Al Jaher filed timely notice of appeal on 6 July 2015.
Standard of Review
Under North Carolina law, it is well established that
[w]hen the trial court sits without a jury regarding a DVPO, the standard of review on appeal is whether there was competent evidence to support the trial court's findings of fact and whether its conclusions of law were proper in light of such facts. Where there is competent evidence to support the trial court's findings of fact, those findings are binding on appeal.
Kennedy v. Morgan, 221 N.C.App. 219, 220-21, 726 S.E.2d 193, 195 (2012) (citation omitted). In addition, this Court has also recognized that
the trial judge is present for the full sensual effect of the spoken word, with the nuances of meaning revealed in pitch, mimicry and gestures, appearances and postures, shrillness and stridency, calmness and composure, all of which add to or detract from the force of spoken words. The trial court's findings turn in large part on the credibility of the witnesses, and must be given great deference by this Court.
Brandon v. Brandon, 132 N.C.App. 646, 651-52, 513 S.E.2d 589, 593 (1999) (citations, internal quotation marks, and brackets omitted).
Analysis
Al Jaher contends that the evidence presented during the DVPO hearing was insufficient to support the district court's factual determinations and conclusions of law. We disagree.
Under North Carolina law, a court must grant a requested DVPO where it finds the occurrence of an act of domestic violence per section 50B-1 of our General Statutes and the DVPO will prevent "further acts" of domestic violence. N.C. Gen.Stat. § 50B-3(a) (2015). Domestic violence is defined in section 50B-1(a), which provides
(a) Domestic violence means the commission of one or more of the following acts upon an aggrieved party ... but does not include acts of self-defense:
(1) Attempting to cause bodily injury, or intentionally causing bodily injury; or
(2) Placing the aggrieved party or member of the aggrieved party's family or household in fear of imminent serious bodily injury or continued harassment, as defined in G.S. 14-277.3A, that rises to such a level as to inflict substantial emotional distress; or
(3) Committing any act defined in G.S. 14-27.21 through G.S. 14-27.33.
N.C. Gen.Stat. § 50B-1(a)(1)-(3) (2015) (emphasis added). In this context, "[t]he test for whether the aggrieved party has been placed in fear of imminent serious bodily injury is subjective; thus, the trial court must find as fact the aggrieved party actually feared imminent serious bodily injury." Smith, 145 N.C.App. at 437, 549 S.E.2d at 914 (2001) (citation and internal quotation marks omitted).
In the present case, Al Jaher argues that the district court's finding that he placed Osman in fear of imminent serious bodily injury is unsupported by competent evidence. Specifically, Al Jaher emphasizes the fact that Osman never explicitly testified during the DVPO hearing that she was actually afraid for her safety during their altercations at the parties' former marital residence on 19 and 22 April 2015. Al Jaher contends further that the past history of abuse cited in the court's order was insufficient to support its conclusion that an act of domestic violence occurred. In support of this argument, Al Jaher relies on this Court's decision in Kennedy v. Morgan, supra.
In Kennedy, the plaintiff obtained a DVPO against her ex-husband after he hired a private investigative service to monitor whether she was living with another man, which would have allowed him to terminate his alimony payments. 221 N.C.App. at 220, 726 S.E.2d at 194. However, apart from this surveillance, the only factual finding that the district court provided to support its legal conclusion that the defendant committed an act of domestic violence against the plaintiff based on the "continued harassment" prong included in section 50B-1(a)(2) was a reference to the long history of abuse that the plaintiff endured before the parties' separation. See id. On appeal, this Court vacated the district court's order. Id. at 225, 726 S.E.2d at 197. As we explained, neither the findings in the order nor the evidence introduced at the DVPO hearing supported the court's determination that by hiring a private investigator, the defendant had "placed [the plaintiff] in fear of continued harassment that rises to such a level as to inflict substantial emotional distress." Id. at 223, 726 S.E.2d at 196. While we recognized that "a vague finding of a general history of abuse" is insufficient, standing alone, to satisfy the statutory definition of domestic violence by fear of continued harassment, we nevertheless acknowledged that "a history of abuse may at times be quite relevant to the [district] court's determination as to whether a recent act constitutes domestic violence." Id. (citations and internal quotation marks omitted).
We believe the present case presents the sort of scenario, identified in Kennedy, in which the history of abuse Osman endured during the parties' marriage is highly relevant to determining whether Al Jaher's conduct on 19 and 22 April 2015 constituted an act of domestic violence. As noted supra, this is a subjective inquiry, one that requires the district court to determine whether Osman "actually feared imminent serious bodily injury" based on Al Jaher's conduct. Smith, 145 N.C.App. at 437, 549 S.E.2d at 914. The evidence presented during the DVPO hearing tended to show an ongoing pattern of abuse by Al Jaher against Osman in retaliation for trivial or perceived wrongs, particularly in relation to childrearing, dating back decades and continuing through August 2014, as well as a more recent series of disagreements and confrontations over the care and custody of the parties' daughter, Fatima, which Al Jaher instigated and prolonged, and which Osman confided to a friend left her "always terrified." Al Jaher complains that Osman never explicitly testified during the hearing that she feared imminent serious bodily injury during the incidents he provoked with her outside their former marital residence on 19 and 22 April 2015, but we do not find the imprecise word choices of a non-native English speaker determinative here, especially given Osman's testimony that she rolled up her windows and locked her vehicle to maintain a physical barrier between herself and Al Jaher, who was so angry that Osman had come to retrieve Fatima that he engaged in a violent physical altercation with their son, Mohammad, before turning his attention to Osman, gaining access to her vehicle, striking her, and then preventing her from leaving.[2] In any event, our case law makes clear that it is the district court that is in the best position to judge the credibility of witness testimony, and this Court must consequently "give[ ] great deference" to those determinations. See Brandon, 132 N.C.App. at 651-52, 513 S.E.2d at 593. The issue of whether Osman subjectively feared imminent serious bodily injury requires such a determination, and-in light of the testimony admitted during the DVPO hearing regarding Al Jaher's conduct on 19 and 22 April 2015 and the general history of abuse Osman endured throughout the marriage-we conclude that competent evidence supports the district court's factual finding, which in turn supports its legal conclusion that Al Jaher committed an act of domestic violence against Osman. Accordingly, the court's order continuing the DVPO for one year is
AFFIRMED.
Judges BRYANT and McCULLOUGH concur.
Report per Rule 30(e).

As a side matter to this appeal, we note that the DVPO in this case expired on 5 June 2016. While as a general rule, "an appeal should be dismissed as moot when events occur during the pendency of the appeal which cause the underlying controversy to cease to exist," this Court has repeatedly recognized that a defendant's appeal of an expired DVPO "has continued legal significance and is not moot" due to the collateral legal consequences that result from such an order. Smith ex rel. Smith v. Smith, 145 N.C.App. 434, 436-37, 549 S.E.2d 912, 914 (2001) (citation, internal quotation marks, and brackets omitted).

We are similarly unpersuaded by Al Jaher's argument that the district court erred in granting the DVPO because no competent evidence supports its finding of fact that on 19 and 22 April 2015, "[t]he defendant inflicted serious injuries upon the plaintiff [by] burning with iron on hands, bruises." Our review of the record makes clear that this finding is a reference to the history of abuse Osman testified she suffered during the parties' marriage. While Al Jaher is correct that this finding of past abuse, standing alone, would not be sufficient to support a conclusion that he committed an act of domestic violence against Osman in April 2015, this argument fails insofar as it erroneously presumes no other competent evidence supports the court's finding that Al Jaher placed Osman in fear of imminent serious bodily injury and ignores the fact that "a history of abuse may at times be quite relevant to the [district] court's determination as to whether a recent act constitutes domestic violence." Kennedy, 221 N.C.App. at 223, 726 S.E.2d at 196 (citations and internal quotation marks omitted).